IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-00286-RBJ

TAYLOR MARIE SHREVE,

    Plaintiff,

v.

CAROLYN W. COLVIN[1], Acting Commissioner of the Social Security Administration,

    Defendant.

## ORDER

This matter is before the Court on review of the Commissioner's decision denying plaintiff Taylor Shreve's application for disability insurance benefits pursuant to Title II of the Social Security Act. Jurisdiction is proper under 42 U.S.C. § 405(g). This dispute became ripe for decision by this Court on July 18, 2013 upon plaintiff's filing of a reply brief. The Court apologizes to the parties and counsel for its delay in addressing the case.

## STANDARD OF REVIEW

This appeal is based upon the administrative record and briefs submitted by the parties. In reviewing a final decision by the Commissioner, the role of the district court is to examine the record and determine whether it "contains substantial evidence to support the [Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998). Substantial evidence is "such relevant evidence as a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit. Fed. R. Civ. P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

reasonable mind might accept as adequate to support a conclusion." *Wilson v. Astrue*, 602 F.3d 1136, 1140 (10th Cir. 2010) (citations omitted). Evidence is not substantial if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted). Thus, although some evidence could support contrary findings, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court might "have made a different choice had the matter been before it de novo." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). However, the Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (citations omitted).

Upon review, the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 45 U.S.C. § 405(g).

## PROCEDURAL HISTORY

Ms. Shreve first applied for disability insurance benefits on November 14, 2010. She claimed inability to work since her alleged onset date of October 20, 2008, due to bipolar disorder, anxiety disorder, and depression. Ms. Shreve's date last insured was June 30, 2010. The Commissioner denied Ms. Shreve's application on January 21, 2011. Ms. Shreve then requested a hearing before an administrative law judge (ALJ), and the ALJ conducted a hearing on June 4, 2012. On June 12, 2012, ALJ Daniel G. Heely issued an opinion denying benefits.

The Appeals Council denied Ms. Shreve's request for review on December 19, 2012. Thereafter, Ms. Shreve filed a timely appeal with this Court.

## FACTS

### General

Ms. Shreve suffers from bipolar disorder, generalized anxiety disorder, and depression. R. 72. She reports symptoms of these disorders dating back to 2004 when she was approximately 16 years old. R. 33. In 2007 she began seeking treatment for insomnia and outbreaks of anger. R. 74, 257–58. At that time Ms. Shreve was prescribed Lamictal. *See* R. 257–58. In July 2007 her physician diagnosed her with bipolar disorder. R. 257. In October 2010 the same physician referred her to a psychiatrist for her bipolar disorder. R. 255.

The record does not contain much more medical information concerning Ms. Shreve's symptoms before the date last insured. However, her stepmother, with whom she lived from February 2010 until June 2010, testified at the disability hearing. According to her stepmother, Theresa Valire, Ms. Shreve exhibited many troubling symptoms during that time.

Upon first arriving in February 2010, Ms. Shreve appeared "very emotional, very overwhelmed, and just sad, just sad." R. 52. Within a couple of months Ms. Shreve exhibited violent behavior towards her husband. R. 52. Ms. Shreve also testified that when she first moved in she felt "[v]ery anxious, irritable, angry, overwhelm[ed]," and that she became violent with her husband. R. 45. During this time Ms. Shreve also suffered from blackouts. R. 52.

According to Ms. Valire, on one occasion Ms. Shreve had a bad reaction to her medication that resulted in her giving Ms. Valire the bottle of pills while saying "Take this before – before I kill myself and take them all." R. 53. Ms. Shreve immediately stopped taking that medication. R. 53.

Ms. Valire also spoke to Ms. Shreve's ability to work. First she stated that during that time period Ms. Shreve would get "very apprehensive" before going to work. R. 53. Then, upon questioning by ALJ Heely, Ms. Valire testified that she didn't believe Ms. Shreve could work full-time. In particular, she said that her "concern would be that Taylor wouldn't make it to work. I would think that she would either end up in an accident or not be able to – she wouldn't be able to get there." R. 56. Overall, Ms. Valire has not seen an improvement in Ms. Shreve's symptoms since she moved out in June 2010. R. 54.

Ms. Shreve has quit all of her former jobs because she has been unable to handle being around people. R. 32, 75. She becomes paranoid, thinking that people are plotting against her, talking about her, and laughing at her. R. 75. In the hearing she stated that the most difficult thing about working again would be "[d]ealing with people and stress. I cannot handle stress at all." R. 43. Back when she worked, she "felt sick every day. I thought it was normal, that everyone got nervous before work. I literally felt like I was going to throw up or have an anxiety attack." R. 48.

Ms. Shreve testified that she is unable to go shopping by herself because of all the people in the store. R. 43–44, 48. She has, at times, put off getting refills for her prescriptions because she didn't want to talk to anyone. R. 46. In a restaurant, she has to sit where she can't see anyone else, and she won't get up to get things, such as napkins. R. 47. Ms. Shreve also freezes up at drive-thru windows: "I can't talk to them. I get nervous that I'm going to mess up the order, or -- I won't talk." R. 47.

Ms. Shreve also testified that she will not conduct activities outside of her home (e.g., going to religious services, going out to eat) unless she is accompanied by someone else. R. 41. She also won't leave the house with her kids unless someone is with them because of her

anxiety. R. 37.[2] Ms. Shreve has trouble driving herself places. She only drives once a week to attend her therapy sessions. R. 44. Ms. Valire testified that she worries for Ms. Shreve when she leaves her house, as "[s]he can barely drive herself." R. 54. Instead, any time they want to spend time together, Ms. Valire has to go pick her up. R. 54.

In spite of these limitations, Ms. Shreve is a competent mother who is able to care for her two young children. She spends her entire day at home with them, and she dresses, bathes, feeds, and plays with them. R. 37–38. Ms. Valire testified that Ms. Shreve is "an excellent mother" and always has been, R. 55, though she helped Ms. Shreve take care of her first child when they all lived together, R. 52–53, 55–56. In particular, she noted that Ms. Shreve did not cuddle the baby as much as she would have, and she felt that Ms. Shreve's stress would transfer over to the baby. R. 55. However, Ms. Valire also noted that she worries that Ms. Shreve "will hurt herself if she's not with [her] kids." R. 35.

When Ms. Shreve is stressed she harms herself, which includes cutting herself. R. 44. In fact, Ms. Shreve testified that she cut herself the night before the hearing because she was worried about it. R. 44. Ms. Shreve also testified that when she is feeling anxious with her kids, she puts them somewhere safe and then goes downstairs or into her closet, where she either screams or cuts herself. R. 45.

On April 28, 2012, Ms. Shreve was admitted to the emergency room after taking an overdose of ibuprofen. R. 414, 416. She said that she had intended to kill herself but that she changed her mind because she wanted to live for her children. R. 437. The hospital filled out an Emergency Mental Illness Report finding that Ms. Shreve appeared mentally ill and appeared to be an imminent danger to herself. R. 437.

**Medical Evidence**

---

[2] Ms. Shreve has two young children.

Ms. Shreve obtained treatment for her psychiatric conditions from her family physician at Greenwood Village Family Medicine from October 2006–October 2010. R. 255–59. As noted above, Ms. Shreve suffered from outbursts of anger as well as insomnia in May 2007. R. 258. At the time she reported that she couldn't sleep because she worried all the time and that she picks fights but then doesn't remember how angry she gets. R. 258. She was prescribed Lamictal to help with these symptoms. R. 258. In June 2007 she was also prescribed Trazodone for sleep and depression. R. 258. In July 2007 Ms. Shreve was still suffering from outbursts of anger, so her Lamictal was increased. R. 257.

While pregnant with her children, Ms. Shreve went off all medications. In May 2010, while pregnant with her second child, Ms. Shreve reported that she was going from "sad to happy" and that she was suffering from "lots of anger (worse this time)." R. 257. At this time her doctor put her back on Lamictal. R. 257. During that summer her medical records indicate constant fluctuations in her mood and changing doses of Lamictal. *See* R. 256–57.

Neither party disputes that Ms. Shreve's symptoms have continued through the date of the hearing. Thus, I will not go into detail regarding her medical treatment after the date last insured. However, I will discuss the medical reports submitted from Drs. Graham, Sexton, and Golosow.

In January 2011 Ms. Shreve was examined at the request of the Commissioner by a consultative psychiatrist, William Graham, M.D. R. 264–68. Based on the examination, Dr. Graham concluded that Ms. Shreve suffered from bipolar mood disorder and generalized anxiety disorder with a GAF of 55.[3] R. 267. He found that her problems were "likely to be chronic and persistent, to wax, and to wane" though with treatment "they might improve somewhat." R. 268.

---

[3] GAF stands for Global Assessment of Functioning. A GAF score of 51–60 indicates "moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in

6

Dr. Graham also performed a functional capacity assessment. R. 268. He tested and assessed Ms. Shreve's memory; sustained concentration, persistence, and pace; social interaction; and adaptation. R. 268. The results were written as a narrative of how Ms. Shreve performed with no formal or final summary.

On January 20, 2011 state agency psychologist Sara Sexton, Ph.D. reviewed Ms. Shreve's medical records, including those from Greenwood Village Family Medicine, and Dr. Graham's evaluation. R. 71–82. Dr. Sexton concluded that Ms. Shreve was credible in her claim that she had been diagnosed with mental disorders. R. 78. However, Dr. Sexton felt that those disorders did not impact Ms. Shreve's functional abilities to the extent she reported. R. 78. Dr. Sexton based this conclusion on Dr. Graham's report. *See* R. 78.

Dr. Sexton then performed a mental residual functional capacity assessment for Ms. Shreve. Overall, she found that Ms. Shreve's symptoms may impact her ability to complete a normal workday or workweek, but that when the work "does not involve tasks of more than limited complexity or attention to detail, limitations of attendance and pace will not prevent her from completing a workday/workweek." R. 79. She also felt that Ms. Shreve should have limited interaction with the public because of her anxiety, but that she can accept supervision and interact with coworkers so long as the contact is not frequent or prolonged. R. 79. She concluded that Ms. Shreve can adapt to work related situations as long as the work demands are within the restrictions established in her mental RFC. R. 79.

In August 2011, after the initial denial of benefits, Ms. Shreve's treating psychiatrist Nikolas Golosow, M.D., submitted a medical source statement regarding Ms. Shreve's ability to do work-related activities. *See* R. 308–09. Just as Drs. Graham and Sexton had done, he

---

social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 34 (4th Ed. 1994) ("DSM-IV").

reviewed Ms. Shreve's medical records from Greenwood Village Family Medicine. *See* R. 307. Dr. Golosow concluded that Ms. Shreve suffered from marked limitations in her ability to understand and remember detailed instructions and to carry out detailed instructions. R. 308. However, she only suffered from a slight impairment in her ability to remember and carry out short, simple instructions. R. 308. Dr. Golosow also found that Ms. Shreve suffered from marked limitations in her ability to interact appropriately with the public, supervisors, and coworkers; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting. R. 309. In his final assessment, he found that Ms. Shreve was unable to tolerate even low stress jobs. R. 309.

### Denial of the Claim

Returning to the ALJ decision, the Social Security Administration uses a five part process to determine whether a claimant qualifies for disability insurance benefits. 20 CFR § 404.1520. At **step one**, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 CFR § 404.1520(a)(4)(i). The ALJ found that Ms. Shreve had not engaged in substantial gainful activity since at least October 20, 2008, her onset date, through her date last insured. R. 15.

At **step two**, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that are "severe." 20 CFR § 404.1520(a)(4)(ii). The ALJ found that Ms. Shreve suffered from the following severe impairments: severe anxiety and depression. R. 15.

At **step three**, the ALJ must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). 20 CFR § 404.1520(a)(4)(iii). The ALJ

determined that none of Ms. Shreve's impairments—alone or in combination—met or medically equaled one of the listed impairments in the Listings. R. 15.

The ALJ analyzed Ms. Shreve's severe impairments under the listing for Anxiety Related Disorders found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06 [hereinafter Listing 12.06]. In doing so, the ALJ found that Ms. Shreve did not satisfy the criteria under paragraph B, which provides that the mental impairments must result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. R. at 15–16; *see also* Listing 12.06 ¶ B. "A marked limitation means more than moderate but less than extreme." R. at 16. The ALJ found that Ms. Shreve suffered from moderate—not marked—limitations for the first three criteria, and that she suffered no episodes of decompensation. R. at 16–17.

In the alternative, the ALJ found that Ms. Shreve did not satisfy the paragraph C criteria, R. at 17, which requires the claimant to suffer from "complete inability to function independently outside the area of [her] home," Listing 12.06 ¶ C.

Before reaching step four, the ALJ is required to determine the claimant's residual functional capacity (RFC). *See* R. 17; 20 CFR § 404.1520(a)(4)(iv). An RFC represents "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The RFC is "the claimant's maximum sustained work capability." *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988). The ALJ found that Ms. Shreve has an RFC to perform "a wide range of medium work" as defined in 20 CFR § 404.1567(c), except that she "is limited to simple, routine and repetitive tasks with only occasional public contact." R. 17.

The ALJ reached this decision by taking into consideration the testimony from the hearing, the objective medical evidence on file, and the record as a whole. R. 17–19. In doing so, the ALJ gave the report of treating psychiatrist Dr. Golosow "little weight." R. 18. I discuss the reasons for this determination in the analysis section below. Further, while the ALJ did not state the weight given to Dr. Graham's report or to Ms. Shreve's testimony, he appears to have given them both at least some weight. *See* R. 18–19.

At **step four**, the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of her past work. 20 CFR § 404.1520(a)(4)(iv). At **step five** the ALJ must determine whether the claimant is able to do any other work that exists in significant numbers in the national economy considering the claimant's RFC, age, education, and work experience. 20 CFR § 404.1520(a)(4)(v). These analyses were performed back-to-back.

During the hearing, the ALJ asked Steven Schmidt, a vocational expert, to assume a hypothetical individual of the same age, educational background, and work history as Ms. Shreve. R. 58. The ALJ then asked whether that person could work full time if he/she "ha[d] insufficient concentration ability for even simple, routine, repetitive tasks, and could have less than occasional public contact, [and] would need numerous unscheduled rest breaks, more frequently than an employer would normally allow." R. 58. Mr. Schmidt responded in the negative.

For the second hypothetical, the ALJ asked whether a person with the same age, educational background, and work history could work full time if he/she "could only work at jobs involving simple, routine, repetitive tasks with occasional public contact." R. 58. This time Mr. Schmidt found that the hypothetical person could work as a "laborer – stores", which constitutes Ms. Shreve's past work. R. 58. Mr. Schmidt then testified that this hypothetical

person could also work as a dish washer, hand packer, and industrial cleaner, other jobs that exist in significant numbers in the national economy. R. 59.

Ms. Shreve's attorney, Ann Atkinson, questioned Mr. Schmidt further. In response to her questions, Mr. Schmidt testified that if the hypothetical person was unable to work at a job where he/she had to meet quotas, the person could not work as a hand packer. R. 60. Mr. Schmidt added that there would be no changes to his other two determinations—dish washer and industrial cleaner—even if the hypothetical person could have only occasional contact with coworkers and supervisors. R. 60.

As a result of this testimony, ALJ Heely found that Ms. Shreve had the residual functional capacity to perform the requirements of her past work, R.19, or, in the alternative, to perform a variety of other "medium work" so long as she "is limited to simple, routine and repetitive tasks with only occasional public contact," R. 17, 19–20.

## ANALYSIS

Ms. Shreve raises four issues on appeal. She claims that the ALJ erred by failing to: (1) obtain medical expert testimony on the issue of medical equivalence to the Listings at step 3; (2) include all of the limitations given in Dr. Sexton's medical opinion in his RFC Assessment, without explanation; (3) give substantial weight to the opinion of Dr. Golosow in his RFC Assessment; and (4) base his credibility findings on substantial evidence.

Overall, this Court finds that the ALJ gave Ms. Shreve's case a thorough review accompanied by a detailed explanation of his decision. However, this Court agrees with Ms. Shreve that the ALJ erred when he did not give substantial weight to the opinion of Dr. Golosow when conducting his RFC analysis. In addition, the Court finds *sua sponte* that the ALJ erred in

failing to take into account Dr. Golosow's medical source statement when deciding whether Ms. Shreve's condition met or equaled the criteria of a Listing.

### A. Medical Expert Testimony

Ms. Shreve argues that the ALJ erred as a matter of law when he did not consult a medical expert to assist him in determining whether her impairments met the requirements of any section of the Listings. She argues that the consultation was mandatory under Social Security Ruling (SSR) 96-6p because she supplemented the record with additional medical evidence.

However, SSR 96-6p mandates such a consultation only "[w]hen additional medical evidence is received that *in the opinion of* the administrative law judge . . . may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." 1996 WL 374180, at *4 (July 2, 1996) (emphasis added).[4] Adopting Ms. Shreve's logic would ultimately require an ALJ to include an updated medical expert opinion in evidence any time the record is supplemented, effectively contravening the discretion given to the ALJ under SSR 96-6p. For this reason, the argument must fail.

### B. Dr. Sexton's Medical Report

Ms. Shreve's next argument is that the ALJ erred by giving "great weight" to the report of the State agency medical expert and then failing, without explanation, to include all of the limitations given in that report in his RFC Assessment. *See* R. 17. Though ALJ Heely refers to Dr. Graham as the State agency medical expert, both parties suggest that the ALJ meant to refer

---

[4] Social Security Rulings "are binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1). The rulings represent "precedent final opinions and orders and statements of policy and interpretations that [the Commissioner has] adopted." *Id.* They are to be relied upon as precedents in adjudicating cases. *See* Social Security Rulings: Preface, *available at* http://ssa.gov/OP_Home/rulings/rulings-pref.html.

12

to Dr. Sexton, who considered Dr. Graham's report among other medical records. [ECF No. 14 at 17; No. 15 at 4, n.2].

Ms. Shreve argues that three limitations in Dr. Sexton's report were not included in ALJ Heely's RFC Assessment. However, two of the limitations she discusses—ability to complete a normal workday or workweek and ability to maintain concentration—were thoroughly analyzed by Dr. Sexton and adopted by ALJ Heely. The third limitation—ability to work in coordination with or proximity to others besides the public—was discussed by the vocational expert, Mr. Schmidt. His conclusion was that this third limitation would not change his assessment that Ms. Shreve could work as a dish washer or industrial cleaner. Thus, any error in not including this limitation in the RFC is harmless. *See Atkinson v. Astrue*, 389 F. App'x 804, 808 (10th Cir. 2010) (unpublished) (finding that the omission in the RFC of a limitation regarding interaction with supervisors was harmless when the vocational expert was asked about and testified to the limitation, with the same outcome).

### C. Credibility Assessment

Ms. Shreve contends that the ALJ's findings regarding her credibility are not based in substantial evidence on the record. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005). However, these determinations "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.*

Ms. Shreve notes that the ALJ recites common ALJ boilerplate -- "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual function capacity." R. 19.

However, she primarily focuses her credibility argument on two points: that observation of Ms. Shreve during the hearing does not constitute substantial evidence bearing on credibility in the circumstances, and that Dr. Graham's consultative examination likewise was improperly viewed as undermining Ms. Shreve's credibility.

This Court has recently discussed the foregoing boilerplate language and has noted that it can be problematic "'when it appears in the absence of a more thorough analysis.'" *Lloyd v. Colvin*, No. 12-CV-3350-RBJ, 2014 WL 503765, at *9 (D. Colo. Feb. 6, 2014) (quoting *Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013)). In this case, however, I do not agree that there was not a more thorough analysis.

First, ALJ Heely thoroughly took into account all of the factors he had in front of him—the administrative record, Ms. Shreve's testimony, and her composure during the hearing—when assessing Ms. Shreve's ability to concentrate. *See* R. 18–19. Although I agree that a live hearing would be preferable to a hearing conducted by an ALJ remotely via video conferencing in terms of assessing the credibility of the claimant's testimony, it does not follow that the ALJ could not consider what the ALJ saw and heard through the video connection or that his observations could not constitute substantial evidence.

Second, the ALJ did not find Ms. Shreve's described limitations less credible due to a misreading or oversimplification of Dr. Graham's report. Quite to the contrary, ALJ Heely discounted parts of the report that conflicted with Ms. Shreve's claimed limitations in order to give her the benefit of every doubt. R. 19. In short, I find from the record that the ALJ's credibility assessment was based on substantial evidence.

**D. Substantial Weight to Treating Physician**

1. <u>RFC Assessment</u>.

The opinion of a treating physician "must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289–90 (10th Cir. 1995). In this case, the ALJ accorded Dr. Golosow's medical source statement "little weight" when making his RFC Assessment. R. 18. He cited a number of reasons for this determination.

First, the ALJ found that the opinion had "little probative value" because it was submitted as a checklist-style form. R. 18. Yet, "the fact that a treating physician's opinion is conveyed through responses to a simple questionnaire does not, standing alone, justify disregarding that opinion where it is based on the physician's history of examining and treating the patient." *Troy ex rel. Daniels v. Apfel*, 225 F. Supp. 2d 1234, 1242 (D. Colo. 2002).[5]

The ALJ also gave little weight to Dr. Golosow's opinion because the form included "only conclusions regarding functional limitations without any significant rationale for those conclusions." R. 18. The crux of this reasoning is again based on the checklist format of the statement. The problem is that Dr. Golosow was the treating physician. If the responses to the checklist were viewed as inadequately explained, the better practice would be to request supplementation of the reasoning.

ALJ Heely also wrote that the opinion was not entitled to any weight insofar as Dr. Golosow reaches a conclusion on the ultimate issue of Ms. Shreve's residual functioning

---

[5] The only opinion that the government cites to suggest that checklist forms are unpersuasive is *Frey v. Bowen*, 816 F.2d 508 (10th Cir. 1987). However, the *Frey* court was particularly suspect of the use of a checklist form when submitted by a *nontreating* physician and "based upon limited contact and examination." 816 F.2d at 515.

15

capacity, "as that issue is reserved to the Commissioner." R. 18. The ALJ cited SSR 96-5p to support this finding. R. 18. Yet, SSR 96-5p explicitly requires that an ALJ give weight to treating source opinions on issues reserved to the Commissioner. 1996 WL 374183, at *2 ("[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner."). Just because those opinions are not entitled to controlling weight or special significance, *see id.*, does not meant they can be completely disregarded.

I also note that ALJ Heely explicitly took into account the functional assessments of Drs. Graham and Sexton. *See* R. 17. As such, then the Golosow assessment must also be taken into account. "[O]pinions from any medical source on issues reserved to the [ALJ] must never be ignored." SSR 96-5p, 1996 WL 374183, at *3.

The ALJ gives one final reason for disregarding Dr. Golosow's opinion, which neither party has discussed. He wrote that the form "appears to have been completed as an accommodation to the claimant . . . ." R. 18. It is natural, I'm sure, for a physician to accommodate his patient when he can. It does not follow, absent other evidence, that his opinion is unduly biased. On the contrary, a treating physician's opinions are generally accorded substantial weight in social security disability cases unless there is good cause to reject them. *See, e.g.*, *Eggleston v. Bowen*, 851 F.2d 1244, 1246 (10th Cir. 1988). The fact that Dr. Golosow's opinions were provided as an accommodation to Ms. Shreve is not, by itself, good cause to reject it. Nor do I find that the reasons given collectively were sufficient to give the opinion little weight.

I am not, and cannot, reweigh the evidence. I am not directing the ALJ to give substantial weight to Dr. Golosow's opinion. I am only finding that the reasons given for giving the opinion little weight are not convincing.

2. <u>Listing Determination at Step 3</u>.

The ALJ did not consider Dr. Golosow's opinion when determining whether Ms. Shreve's impairments met or equaled a Listing at step 3. *See* R. 15–17. Ms. Shreve did not specifically challenge that omission. I mention it only because the case is being remanded for further consideration of Dr. Golosow's report.

Social Security Rulings require ALJ's to take into account "medical source opinions about any issue," including whether a claimant's "impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the [L]istings." SSR 96-5p, 1996 WL 374183, at *2; *see also* 20 C.F.R. § 404.1527(d). Notably, when a treating source provides opinions on issues reserved to the ALJ and the bases for those opinions are not clear, the ALJ is required to "make every reasonable effort to recontact [those treating] sources for clarification . . . ." *Id.* This second requirement reflects the substantial weight the Social Security Administration generally believes treating source opinions should receive, even on issues reserved to the ALJ. Once again, it is not my role to reweigh the Golosow opinion, either individually or in the context of the other medical evidence, nor am I expressing any opinion on whether Ms. Shreve should be found to be disabled. I am only remanding for further consideration of Dr. Golosow's report (and if deemed necessary further investigation and development of the opinions expressed therein).

**ORDER**

The case is REVERSED and REMANDED to the ALJ for further findings consistent with this opinion.

DATED this 24th day of February, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge